**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:96-cr-00067-KMM

RODRIGO BUITRAGO,

      Petitioner,

v.

UNITED STATES OF AMERICA,

      Respondent.

_____/

## ORDER

THIS CAUSE came before the Court upon Petitioner Rodrigo Buitrago's Omnibus Motion for Relief from Final Judgment Pursuant to the *Holloway* Doctrine[1] or alternatively through a Writ of Audita Querela under the All Writs Act, 28 U.S.C. § 1651(a) (ECF No. 405). In essence, Petitioner is attempting to collaterally challenge his life sentence for his role in a cocaine distribution conspiracy through what can only be described as "inventive captioning" in an effort to avoid the Antiterrorism and Effective Death Penalty Act ("AEDPA") restrictions. *Melton v. United States*, 359 F.3d 855, 857 (7th Cir. 2004). Yet, as Judge Easterbrook points out, whether you "[c]all it a motion for a new trial, arrest of judgment, mandamus, prohibition, coram nobis, coram vobis, audita querela, certiorari, capias, habeas corpus, ejectment, quare impedit, bill of review, writ of error, or an application for a Get-Out-of-Jail Card; the name makes no difference. It is [the] substance that controls." *Id.* (citation omitted). For the reasons that follow, Petitioner's Motion is DENIED.

---

[1] Black's Law Dictionary defines "doctrine" as "[a] rule, principle, theory, or tenet of law." Black's Law Dictionary 481 (6th ed. 1990). The equitable and policy reasons expressed in *United States v. Holloway*, 68 F. Supp. 3d 310 (E.D.N.Y. 2014), a case which has no precedential value in this court, can hardly be said to fall within the definition of "doctrine."

## I.      BACKGROUND

In September 1995, Rodrigo Buitrago recruited a drug courier—who, unbeknownst to Buitrago, was a confidential informant ("CI") working with law enforcement—to bring approximately ten (10) kilograms of cocaine from Costa Rica to the United States.  In addition to covering the CI's travel expenses, Buitrago paid her $15,000 in courier fees upon her return. Buitrago arranged to receive the drugs from the CI at a Wal-Mart parking lot in North Miami on November 8, 1995.  During the course of the transaction, Buitrago sensed something was amiss and decided not to enter the vehicle that the CI left behind containing the smuggled narcotics. Instead, Buitrago spoke with one of his co-defendants, Juan Diaz, who proceeded to scrutinize the vehicle for the next several hours, during which Buitrago departed the area.

Convinced that neither Diaz nor Buitrago would repossess the vehicle and its cocaine cargo, law enforcement officials conducted a mock car robbery and drove the vehicle from the parking lot.  Later that evening, the CI received a phone call from an individual known as "Diuza," who requested that she assist Buitrago in recovering the "stolen" vehicle.  The CI declined on the grounds that the car's loss was not her responsibility.  On December 21, 1995, three individuals burst into the CI's home seeking to recover the cocaine and/or the money the CI purportedly stole from Buitrago.  The intruders threatened to kill the CI's children and her elderly aunt, but eventually left when it appeared that local law enforcement officials had arrived to the scene.  Approximately one month later, Buitrago was arrested at an arranged meeting set up between him and the CI in an effort to negotiate the return of the contraband and for Buitrago to receive a partial repayment from the CI as a sign of good will.

After a four day trial in 1996, Petitioner Rodrigo Buitrago was convicted of: (1) conspiracy to import cocaine in violation of 21 U.S.C. § 963 (Count 1); (2) conspiracy to possess

with intent to distribute cocaine in violation of 21 U.S.C. § 846; and (3) using and carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. §924(c).  This Court sentenced him to life imprisonment as to Counts 1 and 2, to run concurrently with each other, and a mandatory 60 months as to Count 3.  *See* (ECF No. 158).  On August 13, 1999, the Court of Appeals for the Eleventh Circuit affirmed Buitrago's conviction and sentence.  *See United States v. Gonzalez*, 183 F.3d 1315, 1319 (11th Cir. 1999).

On May 16, 2001, Buitrago filed a motion to vacate his conviction under 28 U.S.C. § 2255, *see Buitrago v. United States of America*, 01-cv-02009-KMM (ECF No. 1), which the Court denied after adopting the Honorable Charlene H. Sorrentino's Report and Recommendation (ECF No. 14).  *Id.* (ECF No. 17).  On February 24, 2009, the Court denied Buitrago's Motion for Sentence Reduction pursuant to 18 U.S.C. § 3582(c)(2).  *See* (ECF No. 317).  On June 14, 2013, Buitrago again sought to vacate his conviction under 28 U.S.C. § 2255.  *See Buitrago v. United States of America*, 13-cv-22803-KMM (ECF No. 1).  After reviewing Magistrate Judge Patrick A. White's Report and Recommendation, the Court found on August 27, 2013, that Buitrago's Motion was "simply an impermissible attempt to get around the prohibition on filing successive motions to vacate" and dismissed the petition and denied a certificate of appealability.  *Id.* (ECF No. 6).

On April 8, 2015, the Court denied Buitrago's Motion for Sentence Reduction pursuant to 18 U.S.C. § 3582(c)(2).  (ECF No. 383).  That same day, the Court retroactively reduced Buitrago's sentence pursuant to Amendment 599 of the Sentencing Guidelines.  (ECF No. 384).  Based on Buitrago's two-level reduction, the Court entered an Amended Judgment sentencing him to a term of 365 months for Counts 1 and 2, plus 60 months for his 924(c) conviction.  *Id.*

## II.    DISCUSSION

Through the instant motion, Buitrago—a federal prisoner proceeding pro se—requests that the Court vacate, dismiss or set aside Counts 1 and 2 of his conviction, reduce his sentence to 240 months on those counts, to run concurrently, with the 60 months for his 924(c) conviction set to run consecutively which in effect would reduce Buitrago's sentence to 300 months.  *See* Pet'r's Mot. (ECF No. 405).  To accomplish this task, Buitrago asks the Court to consider applying the rationale set out by Judge Gleeson in *United States v. Holloway* that proposes that district courts have the discretion, upon the Government's request, to reduce a defendant's sentence in the interest of fairness "even after all appeals and collateral attacks have been exhausted and there is neither a claim of innocence nor any defect in the conviction or sentence." Buitrago also implores the Court to vacate his sentence through a writ of audita querela.  Before turning to the substantive arguments set forth in Buitrago's motion, the Court will lay out the relevant habeas framework which guides the Court's analysis of the instant motion.

### 1.    AEDPA's Legislative Restrictions on Post-Conviction Review

In the wake of the horrific bombing in 1995 of the Alfred P. Murrah Federal Building in Oklahoma City, Congress enacted AEDPA which "dramatically altered the landscape for federal habeas corpus petitions," *Rhines v. Weber*, 544 U.S. 269, 274 (2005), and imposed significant restrictions on the filing of second or successive habeas petitions in response to the abuse of the habeas writ by prisoners.  *See Felker v. Turpin*, 518 U.S. 651, 664 (1996) ("The new restrictions on successive petitions constitute a modified res judicata rule, a restraint on what is called in habeas corpus practice 'abuse of the writ.'").

4

To be sure, AEDPA is often criticized for its poor draftsmanship and sparse legislative history. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) ("[I]n a world of silk purses and pigs' ears, [AEDPA] is not a silk purse of the art of statutory drafting."); *see also* Note, *The Avoidance of Constitutional Questions and the Preservation of Judicial Review: Federal Court Treatment of the New Habeas Provisions*, 111 Harv. L. Rev. 1578, 1580 (1998) ("There is scant legislative history discussing the habeas provisions."). Despite these shortcomings, courts expressly recognize that Congress's intent in passing AEDPA was to encourage finality and "streamline collateral review and to discourage repetitive and piecemeal litigation." *Triestman v. United States*, 124 F.3d 361, 378 (2d Cir. 1997); *see also Williams v. Taylor*, 529 U.S. 420, 436 (2000) ("There is no doubt Congress intended AEDPA to advance the[]" principles of "comity, finality, and federalism"); *Jones v. United States*, 304 F.3d 1035, 1039 (11th Cir. 2002) ("A fundamental purpose for the AEDPA was to establish finality in post-conviction proceedings.").

After all, finality of criminal sentences is a hallmark principle of our jurisprudential system. *See Johnson v. United States*, 544 U.S. 295, 309 (2005) ("[T]he United States has an interest in the finality of sentences imposed by its own courts."); *Teague v. Lane*, 489 U.S. 288, 309 (1989) ("Without finality, the criminal law is deprived of much of its deterrent effect."); *see also* Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L. Rev. 441, 452 (1963) ("The idea of just condemnation lies at the heart of the criminal law, and we should not lightly create processes which implicitly belie its possibility."). "Perpetual disrespect for the finality of convictions disparages the entire criminal justice system." *McCleskey v. Zant*, 499 U.S. 467, 492 (1991); *see also Custis v. United States*, 511 U.S. 485, 497 (1994) ("[I]nroads on the concept of finality tend to undermine confidence in the integrity of our procedures and inevitably delay and impair the orderly administration of

5

justice.") (internal quotation marks omitted).

For the most part, the passage of AEDPA has had its intended effect.  However, as time marches on, petitioners have increasingly attempted to sidestep the strictures of the Act by resurrecting the various procedural avenues that AEDPA intended to lay to rest.  These efforts to circumvent—or impermissibly expand—the framework for collaterally challenging a sentence are not without costs to both society and the courts.  Such contumacious conduct forces courts to waste scarce judicial resources, inhibits judicial efficiency, and "threatens the capacity of the system to resolve primary disputes."  *McCleskey*, 499 U.S. at 491.  "It is these repeated attacks, which often take on new forms as the legal landscape shifts, that are the evil against which AEDPA [wa]s directed."  *Leal Garcia v. Quarterman*, 573 F.3d 214, 222 (5th Cir. 2009).

For the reasons set forth below, Petitioner's creative captioning does not provide him a platform from which to collaterally challenge his sentence.  Unfortunately, as the Court has recently noted,

> the arguments raised by Petitioner are not exclusive to his case, but are instead indicative of a systematic attempt by petitioners around the country to throw as much mud against the wall with the hope that courts will sift through to see what sticks in order to relieve them of their sentences.  Our Constitution commands no such inquiry.

*Casado v. United States*, No. 1:99-CR-00125-KMM, 2016 WL 4196659, at *3 (S.D. Fla. Aug. 9, 2016).

2.    Buitrago's Asserted Reliance on *Holloway* is Unpersuasive

In *Holloway*, Judge Gleeson recognized the excessive nature of defendant Francois Holloway's mandatory minimum sentence of fifty-seven (57) years for three "stacked" convictions under 18 U.S.C. § 924(c) and called on the U.S. Attorney's Office to agree to an order vacating two of Holloway's three § 924(c) convictions so Holloway could face a "more

6

just resentencing." *Holloway*, 68 F. Supp. 3d at 314.  Judge Gleeson's rationale for requesting the vacatur was that the "stacking" of multiple offenses that arise from the same case often results in a "manifestly unjust mandatory sentence with a disparate impact on black men." *Holloway v. United States*, No. 01-CV-1017, 2014 WL 1942923, at *2 (E.D.N.Y. May 14, 2014) ("Holloway deserved harsh punishment for his three robberies, but no one can reasonably contend that his mandatory sentence was not excessive.").  The United States Attorney's Office—then under the direction of current Attorney General Loretta Lynch—ultimately agreed to the court's vacatur of two of the § 924(c) convictions, and the court proceeded to resentence Holloway on the remaining § 924(c) count.

Although Buitrago attempts to paint the circumstances surrounding his sentencing as being similar to those that led Judge Gleeson to question the severity of Holloway's sentence, the Court is left with a different impression.  First, Buitrago's relatively good behavior in prison over the past twenty years, while admirable, does not warrant a finding that Buitrago's sentence is unconstitutional.  Second, Buitrago's argument that his sentence is disproportionately severe compared to sentences received by other major drug traffickers—like Griselda Blanco and George Jung—is unavailing as there are likely an infinite number of reasons that the sentences varied between these defendants (extent of government cooperation, different counts in the relative indictments, evidentiary basis for conviction at trial, sentencing guidelines, etc.).  After all, the Supreme Court has long sanctioned prosecutors' decisions to seek the imposition of disparate sentences among individuals committing similar offenses.  *See, e.g.*, *Williams v. Illinois*, 399 U.S. 235, 243 (1970) ("The Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences.").

7

A prosecutor's central focus as a sovereign representative "in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). The Government performed this duty faithfully and the Court will not ask the United States Attorney's Office to consider vacating any of Buitrago's convictions on the grounds that his sentence pursuant to the Court's Amended Judgment is grossly disproportionate to the offenses charged. It is not. *See United States v. Theramene*, 517 F. App'x 789, 801 (11th Cir. 2013) (holding that Defendant's "total sentence of 240 months was not grossly disproportionate to the drug-trafficking and firearm offenses he committed, as they involved cocaine, crack cocaine, and possession of a firearm by a felon"); *see also United States v. Bowers*, 811 F.3d 412, 432–33 (11th Cir.), *cert. denied*, 136 S. Ct. 2401 (2016) (affirming 182-year sentence for offender convicted of brandishing firearm during the course of eight robberies and emphasizing that the Eleventh Circuit "has never found a non-capital sentence of an adult to violate the Eighth Amendment").

3.     Petition for Writ of Audita Querela

The All Writs Act allows "all courts established by Act of Congress [to] issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). However, this "residual source of authority to issue writs that are not otherwise covered by statute" does not apply where a statue specifically addresses the issue. *Pa. Bureau of Corr. v. U.S. Marshals Serv*., 474 U.S. 34, 43 (1985); *see also United States v. Holt*, 417 F.3d 1172, 1175 (11th Cir. 2005) ("[A] writ of audita querela may not be granted when relief is cognizable under § 2255."). Although the writ of audita querela was "typically employed by a debtor in a civil case to stop a judgment's execution . . . [it] is now available only to attack a criminal judgment." *Orlansky v. United States*, 627 F. App'x 915 (11th

Cir. 2015). "Despite what a prisoner may entitle his motion, a motion that collaterally attacks a prisoner's sentence as being unconstitutional is a motion to vacate under § 2255." *Walker v. United States*, 367 F. App'x 67, 68 (11th Cir. 2010).

Various circuit courts have explained that the purpose of making the writ of audita querela available in criminal cases is to fill in gaps in the system of federal post-conviction remedies. *See, e.g., Massey v. United States*, 581 F.3d 172, 174 (3d Cir. 2009) (holding that the writ of audita querela "is available in criminal cases to the extent that it fills in gaps in the current system of post-conviction relief"); *Holt*, 417 F.3d at 1175 ("The teaching of *Morgan* is that federal courts may properly fill the interstices of the federal postconviction remedial framework through remedies available at common law."); *United States v. Valdez–Pacheco*, 237 F.3d 1077, 1079 (9th Cir. 2001) ("[T]he common law writs survive only to the extent that they fill 'gaps' in the current systems of postconviction relief.").

Because Buitrago's arguments have previously been examined and denied under the current framework for post-conviction relief, there is no gap in the current system that needs to be filled in by a writ of audita querela. *See* 28 U.S.C. § 2255(a) ("A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence."). The fact that Buitrago may be procedurally barred from bringing another § 2255 petition does not establish that the statutory remedy is inadequate or ineffective. *See Richardson,* 481 F. App'x at 535; *Bedolla-Izazaga v. United States,* 413 F. App'x 20, 21 (10th Cir. 2011); *Valdez-Pacheco*, 237 F.3d at 1080 ("A prisoner may not circumvent valid congressional limitations on collateral attacks by asserting that those very limitations create a

gap in the postconviction remedies that must be filled by the common law writs."). In short, the writ of audita querela is not an appropriate avenue to assist Buitrago in circumventing § 2255's one year statute of limitations period. Moreover, equitable reasons alone—even of the most compelling nature—are insufficient to invoke audita querela. *See United States v. Fonseca-Martinez*, 36 F.3d 62, 65 (9th Cir. 1994) (collecting cases).

## III.    CONCLUSION

Considering Petitioner's creative efforts to end-run AEDPA, Justice Holmes' famous declaration in *Southern Pacific Co. v. Jensen* applies with remarkable force here: "The [] law is not a brooding omnipresence in the sky, but the articulate voice of some sovereign or quasi sovereign that can be identified." *S. Pac. Co. v. Jensen*, 244 U.S. 205, 222 (1917) (Holmes, J., dissenting). Through the passage of AEDPA, Congress clearly articulated the parameters and procedures that a petitioner must follow in order to bring a permissible collateral challenge to their sentence. In doing so, Congress expressly applied its constitutional power to define crimes and their punishments. *Bowers*, 811 F.3d at 433 ("The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offence.") (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812)).

Contrary to Petitioner's request, the Court cannot engage in judicial activism and eschew the mandates it must follow. Therefore, the Court has no legal basis to grant Buitrago any of the various forms of relief he seeks. Accordingly, Petitioner Rodrigo Buitrago's Omnibus Motion for Relief from Final Judgment (ECF No. 405) is DENIED.

This case shall remain CLOSED.  All pending motions not otherwise ruled upon are
DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 16th day of August, 2016.


K. MICHAEL MOORE
CHIEF UNITED STATES DISTRICT JUDGE

c:      All counsel of record